S. Mary Liu (CA SBN 282884)
Aylstock, Witkin, Kreis & Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel: (850) 202-1010
Fax: (760) 304-8933
Email: mliu@awkolaw.com

Hillary Nappi (*pro hac vice* to *be filed*)
Frank R. Schirripa (*pro hac vice to be filed*)
Hach Rose Schirripa & Cheverie LLP
112 Madison Avenue, 10th Fl.
New York, NY 10016
Tel : (212) 213-8311
Fax : (212) 779-0028
Email: hnappi@hrsclaw.com
        fschirripa@hrsclaw.com

James R. Marsh (*pro hac vice to be filed*)
Margaret E. Mabie, (*pro hac vice to be filed*)
Marsh Law Firm PLLC
31 Hudson Yards, 11th Fl
New York, NY 10001
Tel: (212) 372-3030
Fax: (833) 210-3336
Email: jamesmarsh@marsh.law
        margaretmabie@marsh.law

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NORTHERN CALIFORNIA

| | |
|---|---|
| "D.H.",<br><br>                                    Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., formerly known as FACEBOOK, INC.; FACEBOOK HOLDINGS, LLC; FACEBOOK OPERATIONS, LLC; FACEBOOK PAYMENTS INC.; FACEBOOK TECHNOLOGIES, LLC; AND INSTAGRAM, LLC; and SNAP, INC.,<br><br>                                    Defendants. | Case No:_____<br><br>**COMPLAINT**<br><br>Jury Trial Demanded |

1.       The Plaintiff, through her attorneys of record Margaret E. Mabie of Marsh Law

Firm PLLC, S. Mary Liu of Aylstock, Witkin, Kreis & Overholtz, PLLC, and Hillary Nappi of

Hach Rose Schirripa & Cheverie LLP, brings this action against Meta Platforms, Inc.—formerly

known as Facebook, Inc. ("Facebook" or "Meta") and certain subsidiaries—doing business as Instagram ("Instagram"), and Snap, Inc., doing business as Snapchat ("Snapchat") (at times, collectively herein "Defendants"), and alleges as follows:

## NATURE OF THE ACTION

2.      This is a products liability action for physical and emotional distress damages. Plaintiff, D.H., seeks to hold Defendants responsible for their defectively designed products that are marketed to children under 18 without adequate warning of the life-threatening risks these products pose to young developing minds.[1]

3.      Defendants promote these products directly to users under the age of thirteen in violation of federal law.

4.      Defendants have intentionally designed their products to maximize users' screen time using complex non–neutral algorithms[2] designed to exploit human psychology for monetary gain and driven by Defendants' advanced computer algorithms and artificial intelligence products.

5.      For many years, Defendants have had actual knowledge that their social media products are dangerous and harmful to children and teenagers but actively concealed these facts from the general public and government regulators and failed to warn parents about this known harm for continued economic gain.

6.      Defendants' own research reveals that their social media products are a cause of increased depression, suicidal ideation, sleep deprivation, and other serious harms to children that include an increased risk of falling victim to sexual abuse and sexual exploitation both online and offline.

---

[1] *Protecting Youth Mental Health* United States Surgeon General's Advisory, December 7, 2021.
[2] Social media algorithms are designed by social media companies to determine what content to display in a users' feed. Social media companies design their algorithms to prioritize and promote content that keeps users engaged with the product for the longest period of time.

7.      Defendants' products increase the risk of sexual exploitation of minors, but Defendants deliberately fail to design their products with readily available technology to prohibit and limit known Child Sex Abuse Material ("CSAM") on their products.[3]

8.      D.H. grew up in a loving middle-class household with both her parents and siblings. Her parents are working-class individuals that run their own businesses in a city outside California. D.H.'s family raised eight children including D.H.

9.      Although D.H.'s parents worked hard to send her to private school, the harms she suffered from using social media products negatively impacted D.H.'s academic stature such that she was not able to finish her coursework as her parents originally planned for her.

10.     Prior to using Defendants' products, D.H. was a well-adjusted and cared-for child who loved her family and whose family loved her. Each of D.H.'s siblings and parents hold jobs and contribute to society. D.H. feels ashamed that her parents and siblings were unable to avoid the worldwide harm and impact of her child exploitation caused by the use of Defendants' products.

11.     Plaintiff now seeks to hold Defendants responsible for the harms she suffered while a minor from her exposure to and extreme dependency on Defendants' unreasonably dangerous and defective social media products.

---

[3] The term CSAM includes any definition of "Child Pornography" under 18 U.S.C. § 2256(8) and corresponding caselaw, including but not limited to, *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), aff'd sub nom. *United States v. Wiegand,* 812 F.2d 1239 (9th Cir. 1987), and aff'd, 813 F.2d 1231 (9th Cir. 1987); *see also* Canadian Centre for Child Protection Report, *Project Arachind: Online Availability of Chis Sexual Abuse Material,* https://protectchildren.ca/pdfs/C3P_ProjectArachnidReport_Summary_en.pdf (last accessed Aug. 25, 2022).

12.     Plaintiff seeks to hold Defendants responsible for their own acts and omissions. Plaintiff's claims are based on Defendants' design and marketing of dangerously defective social media products, not as the speaker or publisher of any third-party content.

13.     Defendants have actual knowledge that many adult predators use their social media products to facilitate commercial sex acts including the production and distribution of CSAM, yet have purposefully failed to design their social media products to protect child users such as Plaintiff from sexual exploitation and sexual abuse; failed to warn minor users and their parents that sexual predators use their products to recruit minors to perform commercial sex acts; failed to warn minor users and their parents that sexual predators use their products to produce and distribute CSAM; and failed to notify law enforcement about the illegal sexual activity conducted on and through their products.

## PARTIES

14.     "D.H." is an adult and resides outside the State of California.

15.     "D.H." is a pseudonym for the victim-plaintiff in this matter.

## Meta

16.     Founded in 2004 by Mark Zuckerberg ("Zuckerberg") and incorporated in Delaware, but headquartered in Menlo Park, California, Facebook operates the world's largest family of social networking sites which are accessed by more than 3.5 billion users. Facebook, Inc. changed its corporate name to Meta Platforms, Inc. pursuant to an amended and restated certificate of incorporation filed with the Delaware Secretary of State on October 28, 2021.

17.     Meta Platforms, Inc. is a Delaware corporation and multinational technology conglomerate having its principal place of business in the county of San Mateo and city of Menlo Park, California.

18.     Meta develops and maintains social media products, communication products, and electronic devices. These products include, but may not be limited to, Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), and Instagram (and its self-titled app). Meta's subsidiaries include, but may not be limited to, Facebook Holdings, LLC (Delaware); Facebook Operations, LLC (Delaware); Facebook Payments Inc. (Delaware); Facebook Technologies, LLC (Delaware); and Instagram, LLC (Delaware), among others.

**Facebook Subsidiaries**

19.     Facebook Holdings, LLC ("Facebook 1") was incorporated in Delaware on March 11, 2020 and is a wholly owned subsidiary of Meta. Facebook 1 is primarily a holding company for entities involved in Meta's supporting and international endeavors and its principal place of business is in Menlo Park, California.

20.     Facebook Operations, LLC ("Facebook 2") was incorporated in Delaware on January 8, 2012 and is a wholly owned subsidiary of Meta. Facebook 2 is likely a managing entity for Meta's other subsidiaries and its principal place of business is in Menlo Park, California.

21.     Facebook Payments, Inc. ("Facebook 3") was incorporated in Florida on December 10, 2010 and is a wholly owned subsidiary of Meta. Facebook 3 manages, secures, and processes payments made through Meta, among other activities, and its principal place of business is in Menlo Park, California.

22.     Facebook Technologies, LLC ("Facebook 4") was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California and it develops Meta's virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta's various products.

23.     Facebook 1, Facebook 2, Facebook 3, Facebook 4 are collectively referred to as "Facebook."

24.     Facebook operates the world's largest family of social networking products allowing its more than three billion users to connect with others worldwide by sharing status updates, personal photos and videos, and other items of interest.

**Instagram**

25.     Instagram, LLC ("Instagram") was founded in October 2010. In April 2012, Meta purchased the company and reincorporated it on April 7, 2012 in Delaware. Currently, the company's principal place of business is in in Menlo Park, California.

26.     Over time, Instagram has become the most popular photo sharing social media product amongst children and young adults in the United States with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram.

**Snap**

27.     Snap, Inc. was founded in 2011 and incorporated in Delaware with its principal place of business in Santa Monica, California. Snap owns and operates Snapchat, which is considered the most popular social media product among American teenagers.

28.     Snapchat is a photo and short video sharing social media product that allows users to form groups and share posts (referred to as "Snaps") that disappear after being viewed by the recipients.

**JURISDICTION AND VENUE**

29.     The Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

30.     This Court has personal jurisdiction over Defendants because they are each headquartered and have their principal place of business in the State of California. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant Meta's principal place of business is in the Northern District of California and Defendant Snap, Inc. is a resident of the State of California.

## FACTUAL ALLEGATIONS

### COPPA Prohibits the Collection of Children's Personally Identifiable Information Without Verifiable Parental Content

31.     Recognizing the vulnerability of children in the internet age, in 1999 Congress enacted the Children's Online Privacy Act ("COPPA"). *See* 16 U.S.C. §§ 6501-6505. COPPA's express goal is to protect children's online privacy. Under COPPA, developers of child-focused apps and websites cannot lawfully obtain the personally identifiable information of children under thirteen years of age without first obtaining verifiable consent from their parents.

32.     COPPA applies to any operator of a commercial website or online service that is directed to children under thirteen years of age and that: (a) collects, uses, and/or discloses personally identifiable information, or (b) on whose behalf such information is collected or maintained.

33.     Under COPPA, personally identifiable information is "collected or maintained on behalf of an operator…[t]he operator benefits by allowing another person to collect personally identifiable information directly from users of" an online service. 16 C.F.R. 312.2.

34.     Further, COPPA applies to any operator of a commercial website or online service that has actual knowledge that it collects, uses, and/or discloses personally identifiable information from children.

35.     Under COPPA, "personally identifiable information" includes information such as (1) first and last name; (2) A home or other physical address including street name and name of a city or town; (3) online contact information as defined in this section; (4) a screen or user name where it functions in the same manner as online contact information, as defined in this section; (5) a telephone number; (6) a Social Security number; (7) a persistent identifier that can be used to recognize a user over time and across different Web sites or online services. Such persistent identifier includes, but is not limited to, a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier; (8) a photograph, video, or audio file where such file contains a child's image or voice; (9) geolocation information sufficient to identify street name and name of a city or town; or (10) information concerning the child or the parents of that child that the operator collects online from the child and combines with an identifier described in this definition.

36.     To lawfully collect, use, or disclose personally identifiable information, COPPA requires that an operator meet specific requirements, including each of the following:

    a.    Posting a privacy policy on its website or online service providing clear, understandable, and complete notice of its information practices, including what information the website operator collets from children online, how it uses such information, its disclosure practices for such information, and other specific disclosures as set forth in the Rule;

    b.    Providing clear, understandable, and complete notice of its information practices, including specific disclosures, directly to parents; and

    c.    Obtaining verifiable parental consent prior to collecting, using, and/or disclosing personally identifiable information from children.

37.     Under COPPA, "[o]btaining verifiable consent means making any reasonable effort (taking into consideration available technology) to ensure that before personally identifiable information is collected from a child, a parent of the child…[r]eceives notice of the operator's personally identifiable information collection, use and disclosure practices; and [a]uthorizes any collection, use, and/or disclosure of the personally identifiable information." 16 C.F.R. 312.2.

38.     The FTC recently clarified acceptable methods for obtaining verifiable parent consent, include: (a) Providing a form for parents to sign and return; (b) Requiring the use of a credit/card online payment that provides notification of each transaction; (c) Connecting to trained personnel via video conference; (d) Calling a staffed toll-free number; (e) Asking knowledge based questions; or (f) Verifying a photo-ID from the parent compared to a second photo using facial recognition technology.

39.     Each Defendant is an "operator" pursuant to COPPA. Specifically, COPPA defines an "operator," in pertinent part, as: "any person who operates a Web site located on the Internet or an online service and who collects or maintains personally identifiable information from or about the users of or visitors to such Web site or online service, or on whose behalf such information is collected or maintained, or offers products or services for sale through that Web site or online service, where such Web site or online service is operated for commercial purposes involving commerce among the several States or with 1 or more foreign nations; in any territory of the United States or in the District of Columbia, or between any such territory and another such territory or any State or foreign nation; or between the District of Columbia and any State, territory, or foreign nation." 16 C.F.R. 312.2.

40.     Defendant Meta maintains that children under the age of thirteen are prohibited from having Meta accounts, but Meta knowingly lacks effective age-verification protocols. Since

at least 2011, Meta has known that its age-verification protocols are largely inadequate, then-estimating that it accounts for 20,000 children under age thirteen from Facebook every day.[4] The problem has not been remediated, as Meta accounted for at least six hundred thousand underage users in 2021. Zuckerberg himself stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.[5]

41.    Defendants collect personal information of all users, including children under the age of thirteen, without obtaining verifiable consent from their parents.[6]

42.    Defendants provide their products free of charge, relying on income from selling user data as well as from selling targeted advertisements for a premium. User data is organized and collected by Defendants and then later studied and sorted by Defendants' non–neutral algorithms to drive profits. Thus, Defendants generate revenue from selling user data directly as well as from maximizing screen time and user engagement to increase the value of advertisements shown to users on their platforms.

---

[4] Smith, Catherine, *Facebook Removes 20,000 Underage Users Everyday*, HUFF POST, (March 23, 2011) https://www.huffpost.com/entry/facebook-underage-users_n_839437 (last accessed Aug. 25, 2022)

[5] Hill, Kashmir, *Mark Zuckerberg Is Wrong About Kids Under 12 Not Being Allowed on Facebook*, FORBES (May 2011), https://www.forbes.com/sites/kashmirhill/2011/05/20/mark-zuckerberg-is-wrong-about-kids-under-13-not-being-allowed-on-facebook/ (last accessed Aug. 25, 2022)

[6] 15 U.S.C. § 6501; In 2015, Mattel designed and manufactured a children's toy with a microphone that recorded and transcribed what child users said to the doll via speech to text technology. Mattel captured user data from child users of this "Hello Barbie" toy and maintained it for the development of AI. In 2016, a class action lawsuit was filed against Mattel which alleged COPPA violations. The case was removed to federal court and settled on undisclosed terms. Similarly, Defendants in this case are collecting, analyzing, and monetizing personal information from children under the age of thirteen without verifiable parental consent.

43.     Meta's products include its flagship social networking product, Facebook, which allows people around the world to connect, share, discover, and communicate with each other on personal computers and mobile devices.[7]

44.     Meta's other products include Instagram, a community for sharing photos, videos, and private messages; Facebook Messenger, a messaging application for people to connect with friends, family, groups, and businesses across products and devices; and WhatsApp, a messaging application used by people and businesses to communicate.

45.     Snap's products include Snapchat (a photo and short video sharing social media product that allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients, and Bitmoji (a social media product that allows users to create and share personalized emoticons).

46.     Snapchat also allows users, including children under the age of thirteen, to share their location which allows the user's followers (and the public for Snaps submitted by users) to see the user's location on a map.

47.     None of the Defendants require proper age verification or authentication of child users, specifically child users under the age of thirteen.

**Defendants Know their Products Cause Children to Develop a Severe Social Media Dependency Including Obsessive–Compulsive Behaviors**

48.     Defendants promote their social media products as free to the public but monetize private and personal user data. Defendants collect, analyze, use, and sell their users' private and personal data, including their online behavior, for monetary gain regardless of age.

---

[7] Facebook Help Center, https://www.facebook.com/help/1561485474074139 (last accessed Aug. 25, 2022).

49.     Increasing the total time individual users spend on the Defendants' products generates more advertising revenue for them. Advertisers pay Defendants based on their user metrics and increasing the number of user impressions and engagements with advertisements on Defendants products is beneficial to Defendants.

50.     Defendants have intentionally designed their products to maximize user engagement and utilize complex non–neutral algorithms driven by the most advanced computer technology and artificial intelligence available to exploit human psychology.

51.     With complete disregard to user safety, Defendants designed and continuously modified their products to encourage problematic and excessive user engagement that they know is addictive and maladaptive.

52.     One of the design elements present in Facebook, Snapchat, and Instagram is the utilization of complex non–neutral algorithms to select and promote content in a manner that promotes addictive behaviors.

53.     Snapchat also features a series of rewards including trophies, streaks, and other signifiers of social recognition similar to the "likes" metrics available in other products. These features are designed and promoted to encourage users to share their videos and posts with the public with the ultimate goal of increasing user engagement with the product. Snapchat also promotes an explore feed that displays content created by others user around the world including advertising content.

54.     Snapchat deploys ever-changing rewards designed to encourage users to engage with Snapchat in dangerous ways. Snap knows or should know that its design has resulted in extreme, risky, and addictive behaviors for users, including by its largely teenage and young-adult

users. Indeed, Snap knowingly or purposefully designs its products to encourage unhealthy behavior in users, including child users.

55.     Some of the awards and achievements created and conferred by Snapchat are often unknown to users and users do not discover the requirements for specific achievements until they obtain or unlock them by engaging with the product. This design is unsafe for children and conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable means to maintain a desired behavior over time.

56.     The system is designed to reward increasingly extreme user behavior because users are not actually fully aware of what interactions result in awards and achievements.

57.     Instagram, like Snapchat, has design features that do not enhance the communication function of the application, but instead exploits users' susceptibility to persuasive design and the compulsive accumulation of rewards including "likes" and "followers." This design is unreasonably dangerous to the mental well-being of children and their developing minds.

58.     Internal Meta documents identified the reduction in usage by children as an "existential threat" to business.

59.     In response, Meta has designed its products to attract and retain children.

60.     One such addictive design element is as follows: when children seek and receive "likes," it causes their brains to release euphoria-causing dopamine. As soon as dopamine is released, however, the euphoria is countered by dejection. In response, child brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after the dejection abates. Defendants' non–neutral algorithms are designed to exploit users' innate tendency to counteract dejection by returning to the source of pleasure for another dose of euphoria.

61.     Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger the child users' dopamine responses increases. As a result, children continue to use social media, not for enjoyment, but simply to feel normal. When children try to stop using social media products, they experience symptoms of withdrawal including anxiety, irritability, insomnia, and craving.

62.     Addictive use of social media by children is psychologically and neurologically analogous to internet gaming disorder which is recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM–5) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases.

63.     Social media addiction is similar to addictive gaming disorder and includes: (1) preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when the product is taken away or use is not possible; (2) tolerance—the need to spend more time using social media to satisfy the urge; (3) inability to reduce social media usages, unsuccessful attempts to quit gaming; (4) giving up other activities, loss of interest in previously enjoyed activities due to social media usage; (5) continuing to use social media despite problems; (6) deceiving family members or others about the amount of time spent on social media; (7) using social media to relieve negative moods, such as guilt or hopelessness; and (8) jeopardizing school or work performance or relationships due to social media usage.

64.     The non–neutral algorithms in Defendants' social media products exploit the diminished decision-making capacity, impulse control, emotional immaturity, and psychological resiliency in children that is related to the users' evolving brain development. Defendants know or should know that since their child users' frontal lobes are not fully developed, such users are much

more likely to sustain serious physical and psychological harm through social media use than adult users. Nevertheless, Defendants have failed to design their products to account for and ameliorate the psychosocial immaturity of their child users.

65.     Defendants' revenues are directly associated with the amount of time its users spend online. Defendants increase revenue by maximizing users' engagement and designed products that addicts users. Some of the features of Defendants' products that make them highly addictive include the use of intermittent variable rewards ("IVR") and its Facial Recognition System ("FRS").

66.     IVR is designed to addict a user to an activity and allows for anticipation and craving to develop in ways that compound addictive tendencies with each use of the product. For Meta, this means refreshing the product's user feed that is generated and organized by Meta to consistently check for notifications or social rewards. As explained below, Meta spaces out notifications of likes and comments into multiple bursts (known as dopamine gaps which cause addictive cravings), rather than notifying users of new notifications in real time. Meta designs its user notification system to maximize their products' addictiveness and fails to warn users, especially those under thirteen, of the risks and harms associated with this design, nor does it provide users with the opportunity to receive notifications in real time.

67.     Engineered to takeover users' attention span, Meta introduced its most effective form of IVR in February of 2009: its "Like" button that counts the number of interactions a user receives on each post. Instagram launched in the same year with a similar design function. Additional IVR features include Meta's delay-burst notification system and other features designed to trigger addictive and obsessive tendencies in users. Instagram's notification algorithm also delays notifications to deliver them in spaced-out larger bursts. These intentionally harmful

and defective product designs take advantage of all users' desire for social validation and causes addiction, obsession, and social media dependencies in users without sufficient warning.

68.     Other design features used to manipulate social media users include, but are not limited to, the ability for users to make on-platform payments through FacebookPay and Snapchat Premium, the FRS system which is a feature of Meta that has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos, and "matching" which matches users, including child users, with strangers using a feature called "suggested friends." The perilous amalgamation of intense psychological vulnerability and targeted exploitation of child users by Defendants foreseeably results in an increased risk of a variety of harms including, but not limited to, social media addiction, obsessive compulsive disorder, withdrawal from friends, family, and social and academic advancement, lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, increased risky behavior, exposure to child predators, sexual exploitation, self-harm, suicidal ideations, and suicide.

69.     The Defendants' product design and architecture caused D.H.'s harm and her claims against the Defendants rest entirely on "nothing more than [their] own acts." *Lemmon v. Snap, Inc.,* 995 F.3d 1085, 1094 (9th Cir. 2021).

70.     "Plaintiff's contention is that the product is designed a way that connects individuals who should not be connected." *A.M. v. Omegle.com, LLC,* No. 3:21-CV-01674-MO, 2022 WL 2713721, at *4 (D. Or. July 13, 2022).

**Meta Concealed Its Knowledge that Its Products Increase the Risk that Child Users
Will Fall Victim to Mental Anguish, Social Media Dependencies, Sexual Abuse
and Exploitation Online and Offline**

71.     In 2021, Facebook made numerous false and misleading statements in its Code of Conduct concerning the company's commitment to user safety. For instance, Facebook's Code of Conduct, which the company posted on its website, stated that "[o]ur reach and influence require that we commit and hold ourselves accountable to a high standard, ensuring that we build products and programs that have a positive impact, keep people safe and serve everyone." The Code of Conduct also stated that one of Facebook's five core principles is to "keep people safe and protect privacy" and emphasized that "we are committed to protecting our communities from harm."

72.     In its Code of Conduct, Facebook also described its purported mandate to "innovate responsibly by making every effort to anticipate and mitigate potential harms in all that we build" and emphasized that "Facebook is committed to maximizing the positive impact we have on people and society through all that we build." As part of that mandate, Facebook stated it "[c]onsider[s] a broad range of potential impacts on people, communities and society, looking across different dimensions of responsibility, such as inclusion, safety, privacy and others" and that it "[r]aise[s] and address[es] potential harms early and often throughout the product development process." Facebook also stated that it "[w]ork[s] quickly to identify and remove harmful content from Facebook platforms, such as hate speech, harassment, child exploitation, threats of violence and terrorism," and emphasized that "[s]afety is one of our Responsible Innovation Dimensions.

73.     The reality began to emerge on September 13, 2021, when The Wall Street Journal first published its series of five articles referred to as "The Facebook Files." Soon thereafter, Facebook changed its name to Meta. Those articles cited to a trove of internal Meta documents obtained from a whistleblower later identified as Frances Haugen. Those documents revealed that

Meta knew its products contain design flaws that cause significant harm to users (specifically child users), but which Meta misrepresented to and hid from the public. Significantly, the documents show that although Meta makes public assurances regarding its own conduct, Meta is "not actually doing what [they] say [they] do publicly."

74.     On September 14, 2021, The Wall Street Journal revealed that Facebook's own in-depth analyses concluded that there were significant mental-health issues caused by the use of Instagram among teenage girls, many of whom linked suicidal thoughts and other harms to their use of the product.

75.     Facebook's researchers have repeatedly found that Instagram is harmful to teen users. Specifically, in an internal presentation from 2019, Facebook researchers concluded that "[w]e make body issues worse for one in three teen girls" and "[t]eens' blame Instagram for increases in the rate of anxiety and depression."

76.     Meta's research determined that their social media products cause increased depression, suicidal ideation, sleep deprivation, and other serious harms. Meta researchers found that Instagram is "worse" than many competitor products.

77.     On September 15, 2021, The Wall Street Journal published an article detailing how an algorithm design change that Facebook introduced in 2018 to control and organize how information appears in each user's news feed harms users. In an internal report, Facebook data scientists concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability."

78. Facebook data scientists also concluded that because of the design of Facebook's news feed feature's algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent" for users of its product.

79. Other documents show that Facebook employees also discussed the company's motive for changing its algorithm design, namely that a decrease in user activity led to decreased revenue. Facebook discovered that the inflammatory content that their non–neutral algorithm was designed to promote increased user engagement with the product and sold more digital ads to support the company's bottom line.

80. On September 16, 2021, The Wall Street Journal revealed that Facebook has weak and ineffective responses to drug cartels and human traffickers that use the company's products to facilitate illegal activities, which may include the ongoing spread of CSAM. Internal documents show that Facebook employees raised red flags about the use of the company's products in developing countries. Indeed, an internal company report from March 2021 found that bad actors were frequently utilizing Facebook to promote violence, exacerbate ethnic divides, and delegitimize social institutions, concluding that the company's "[c]urrent mitigation strategies are not enough."

81. On September 28, 2021, the day after Facebook announced that it had paused its development of Instagram Kids, The Wall Street Journal published an article citing internal Facebook documents that detailed the company's significant efforts to direct their products to child users, including Facebook's "big bets" on designing products that would appeal to children ages ten through twelve.

82. According to one internal document from 2020, the reason that Facebook "care[s] about tweens" is because "[t]hey are a valuable but untapped audience." Facebook's willingness

to target vulnerable children further demonstrates just how desperate Facebook has become in the face of declining user growth and profitable engagement.

83.     On October 3, 2021, the Facebook whistleblower revealed her identity during a televised interview on the CBS News program 60 Minutes. During the interview, Frances Haugen, a data scientist and former project manager at Facebook, disclosed that "[t]he thing I saw at Facebook over and over again was there were conflicts of interest between what was good for the public and what was good for Facebook. And Facebook, over and over again, chose to optimize for its own interests, like making more money" and repeatedly "has shown it chooses profit over safety."

84.     Haugen explained that Facebook's non–neutral algorithm optimizes content that generates engagement, emphasizing content that is angry, divisive, and polarizing because "they'll get more views." Haugen noted that "Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click less ads, [and] they'll make less money."  Facebook intentionally designs its algorithms to be non–neutral and harmful to increase user engagement and, in turn, boost revenue through increased advertisers and advertising impressions.

85.     Meta is fully aware that child users are vulnerable. Meta is further aware that, despite their products' adverse impact on child and teen users' well-being, the absence of impulse control often leaves users dependent on and obsessed with Meta's products, as well as socially conditioned to continue to use Meta products. Meta is aware that many users are unable to stop using their products. Meta also knows that their products dramatically exacerbate bullying, the spread of CSAM, and other socially maladaptive behavior that harms children.

86.     By modifying the Facebook newsfeed from a chronological rendering to a non–neutral algorithm–driven presentation, Meta knowingly altered its social networking apparatus to create a product that is profoundly more negative than organic user activity would make it. Meta knowingly created a product that exploits some of the known psychological vulnerabilities of Facebook's most susceptible users—children—resulting in a markedly increased threat to children's mental health, an increase in the prevalence of CSAM within its products, and other serious harms.

87.     Excessive screen time is dangerous to adolescents' mental health, sleep patterns, circadian rhythm, social life, and overall emotional well-being. Defendants' products neither include warnings that excessive and expected product use can disrupt healthy sleep patterns nor specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. These factors render Defendants' products unreasonably dangerous.

88.     Further, Meta knows its quality-control and age-verification protocols are woefully ineffective and is either unwilling or incapable of properly designing its products to mitigate harm. This is consistent with its established pattern of recognizing, and subsequently ignoring, the unique needs and vulnerabilities of its child users and its obligation to create a suitable environment accessible only by its age-appropriate users.

89.     Facebook began using PhotoDNA and other technology in its product design as early as 2011, but Facebook has continually thwarted its effectiveness and success with design modifications.

90.     Furthermore, in recent years Meta is changing its product design in ways that harm victims of CSAM, like D.H., without warning users or their families.

91.     PhotoDNA and other similar tools are image comparison technology that use algorithms to assist in detecting matches between modified versions of the same image or images. It is sometimes referred to as "fuzzy matching" or "perceptual hashing." Take, for example, two versions of the same image: one in full color, the other in black and white. To a computer these are fundamentally completely different images; to the human eye, these are understood to be images depicting the same thing. This limitation is what these tools are designed to overcome.[8]

    

92.     These tools are not artificial intelligence nor are they facial recognition technology, rather they are a mathematical algorithm that allow systems to return values indicating the "closeness" between two images. These tools look at the visual content of the image instead of the exact binary image data (i.e. the digital fingerprint) as is the case with cryptographic hashes. By calculating the mathematical closeness between two values, it is possible to verify that two different versions of the same image are effectively the same image. Even if an image is edited very slightly, such as resized or saved in a different format, these algorithms will still match against that image. Suspect images processed using these tools are then compared against databases of previously verified CSAM provided by law enforcement or child protection agencies.[9]

---

[8] How PhotoDNA for Video is being used to fight online child exploitation – On the Issues (microsoft.com); *How does PhotoDNA work?* Microsoft, https://www.microsoft.com/en-us/photodna
[9] This is a process called "hashing." For a fuller explanation, see Hany Farid, An Overview of Perceptual Hashing, Journal of Online Trust and Safety (October 2021) at 2-3, Stanford Internet Observatory, https://tsjournal.org/index.php/jots/article/download/24/14; Jennifer Langston, HOW PHOTODNA FOR VIDEO IS BEING USED TO FIGHT ONLINE CHILD EXPLOITATION ON THE ISSUES



93.    A 2020 report by the Canadian Centre for Child Protection revealed that Meta, Snap, and other social media platforms design their products in a way that makes the ability to report CSAM difficult, if not impossible, for users. While CSAM can be reported as generally harmful material, Defendants designed their products so there is no CSAM-specific reporting function. Therefore, users are unable to specifically report CSAM contraband—which includes all sexually explicit or harmful images of any child—to the company. Defendants could easily design products that promote child protection and Defendants should allow users to report content directly and specifically as CSAM or material related to child exploitation.[10] They willfully do not.

(2020), https://news.microsoft.com/on-the-issues/2018/09/12/how-photodna-for-video-is-being-used-to-fight-online-child-exploitation/

[10] See note 14, supra.

94.     Meta products lack any convenient feature to allow users to specifically report CSAM even though doing so would facilitate the interdiction of CSAM and help limit the spread of CSAM through its products.[11]

95.     Moreover, even by detecting CSAM that is known and identified, social media companies like Meta and Snap—which operate at major scale with "billions of daily uploads"—may prioritize factors like "efficiency" (*i.e.*, cost and scalability) and "distinctness" (*i.e.*, more specificity) while compromising other factors like "tolerance" (*i.e.*, less specificity) of the detection model, potentially resulting in underreporting of actual incidents of CSAM within its product.[12]

96.     Meta apparently fails to utilize freely available and industry proven child protection tools such as Project Arachnid Shield to safely design their products and prevent child exploitation and the distribution of CSAM through their products.

97.     Project Arachnid is a free Application Programming Interface ("API") that Defendants could incorporate into the design of their social media products, which would increase the safety of Defendants' products.[13]

98.     Shortly after Haugen's disclosure of Meta's harms to children, an unnamed whistleblower and former Facebook employee disclosed in a five-page document that Meta's

---

[11] *Id*. at 10.
[12] *See* Hany Farid, An Overview of Perceptual Hashing, Journal of Online Trust and Safety (October 2021) at 10, Stanford Internet Observatory, https://tsjournal.org/index.php/jots/article/download/24/14 "In practice, the choice of a hash is based on a number of factors, including: 1. Scale. When operating at the scale of a major social media platform, for example, with billions of daily uploads, any hash must be highly efficient and distinct. At this scale, even a 1/100 or even 1/10,000 false positive rate (incorrectly matching two images) is untenable. 2. Tolerance. When trying to limit the upload of, for example, legal adult pornography, resilience may be less important than, for example, trying to limit child sexual abuse imagery."
[13] Home – Project Arachnid

efforts to address the prevalence of CSAM within its products were "inadequate" and "under-resourced."[14]

99.     This whistleblower also stated that Meta "doesn't track" the full scale of the CSAM problem within its products. Senior executives consistently limit the funds available for child protection design efforts by focusing on the company's "return on investment."

100.     The whistleblower also revealed that the "Groups" product within Facebook facilitates harm to children because the product design allows predators to "use code words to describe the type of child, the type of sexual activity...[and] they use Facebook's encrypted Messenger service or WhatsApp to share these codes, which change routinely."

101.     Similarly, Facebook policies fail to adequately protect children, especially teens. Facebook creates its own definition of CSAM that fails to sufficiently meet the clear requirements provided in 18 U.S.C. 2256(8) and related case law.[15]  Facebook then uses its own definitions to deliberately fail to report harmful CSAM to the authorities as required by law.

102.     In 2020 alone, Meta products accounted for over 20,000,000 reports of CSAM to the National Center for Missing and Exploited Children ("NCMEC"). If Facebook continues to design its products in a way to be even more unsafe for children, then over 70% of those CSAM reports could go undetected and thereby unreported.[16]

---

[14] Crawford, Angus, *Whistleblower: Facebook's* response *to child abuse 'inadequate',* BBC NEWS, (October 28, 2021) https://www.bbc.com/news/technology-59063768 (last accessed Aug. 25, 2022)

[15] Keller, Michael H., *Adults or Sexually Abused Minors? Getting It Right Vexes Facebook,* New York Times, (March 31, 2022), https://www.nytimes.com/2022/03/31/business/meta-child-sexual-abuse.html (last accessed Aug. 25, 2022).

[16] Letter to Mark Zuckerberg from Department of Justice, October 4, 2019. https://www.justice.gov/opa/press-release/file/1207081/download (last accessed Aug. 25, 2022).

103.    The United States Department of Justice has urged Mark Zuckerberg to "embed the safety of the public in system designs" and encouraged Meta to "act against illegal content effectively with no reduction to safety" in ways that safeguard victims.[17]

104.    In November of 2021, Meta indicated that it would postpone certain product design development that created an increased risk and volume of CSAM within its products. Meta nonetheless implemented changes to its products like Messenger in January of 2022 that increased the risk and volume of predators and CSAM without sufficiently warning users, including child users and their parents.[18]

105.    18 U.S.C. § 2258A mandates that Meta report suspected CSAM to NCEMC. To limit and avoid its reporting requirements under federal law, Meta purposefully designed its products—which it knows are used by children, including children under thirteen—to purposefully ignore modern CSAM detection technology. This technology is free for Meta to implement within its product design.

106.    Meta products also lack any convenient CSAM-specific reporting function.[19] A 2020 report by the Canadian Centre for Child Protection revealed that Facebook, Instagram, and other social media platforms design their products so that the ability for users to report CSAM are difficult, if not impossible. While CSAM can be reported as harmful, the Defendants designed their products such that there is no CSAM-specific reporting function. Therefore, users are unable to specifically report CSAM contraband, which includes all sexually explicit or harmful images of any minor to the company. The ability for the Defendants to design products that promote child

---

[17] *Id*. at 2.
[18] Express Yourself in Messenger's End-to-End Encrypted Chats – Messenger News (fb.com)
[19] Canadian Centre for Child Protection, Reviewing Child Sexual Abuse Material Reporting Functions on Popular Platforms, https://protectchildren.ca/pdfs/C3P_ReviewingCSAMMaterialReporting_en.pdf (last accessed Aug. 25, 2022)

protection is not complex, and the Defendants should allow users to report content directly and specifically allow users to report it as CSAM or material related to child exploitation.[20]

107.    Facebook, Facebook Messenger, WhatsApp, and Instagram do not allow users to specifically report any material posted on its platform as CSAM.[21]

108.    Similarly, Facebook does not allow a user to report harmful content without first logging into the platform and using the product.

**Snap Concealed Its Knowledge that Its Products Increase the Risk that Child Users Will Fall Victim to Mental Anguish, Social Media Dependencies, Sexual Abuse and Exploitation Online and Offline**

109.    Snapchat has developed several unique features that make it stand out from its competitors. First, Snapchat messages disappear from the interface after viewing ("ephemeral messaging function"). This contributes to a sense of impunity for many Snapchat users, encouraging and fomenting exploitation and predatory behavior, a fact that has been observed in multiple empirical studies of frequent users.[22]

110.    According to studies, Snapchat users believe their conduct is hidden and accordingly feel empowered to engage in criminal behavior on Snapchat without fear of getting caught.[23] Moreover, Snapchat's ephemeral messaging design contributes to a false level of intimacy between users.

---

[20] *Id., at 9-10, 16-17.*
[21] *Id.*, at 10.
[22] Snapchat by the Numbers: Stats, Demographics & Fun Facts, OMNICORE (March 2, 2022), https://www.omnicoreagency.com/snapchat-statistics/ (last accessed Aug. 25, 2022).
[23] *See*, e.g., Leah Moyle, et al., *#Drugsforsale: An exploration of the use of social media and encrypted messaging apps to supply and access drugs*, 63 INTERNATIONAL JOURNAL OF DRUG POLICY (Jan. 2019), https://doi.org/10.1016/j.drugpo.2018.08.005.

111.    Critically, Snapchat's disappearing messaging is intended to entice users to share highly personal photos and information that many users would otherwise feel uncomfortable sharing on "higher-stake" apps."[24]

112.    Also, because of its design, users perceive Snapchat communications as less formal than interactions on other social media. Studies have also found that the "close ties" generated between teenagers on the app foster the conditions for grooming and other predatory behavior.[25]

113.    In November 2019, a bipartisan group of Senators sent a letter to 36 leading tech companies including Snapchat. The letter sought answers about the online sexual grooming of children and CSAM detection technologies including:[26]

a.   What measures have you taken to ensure that steps to improve the privacy and security of users do not undermine efforts to prevent the sharing of CSAM or stifle law enforcement investigations into child exploitation?

b.   Have you implemented any technologies or techniques to automatically flag CSAM that is new or has not been previously identified, such as the use of machine learning and image processing to recognize underage individuals in exploitative situations?

c.   If your platform(s) include a search engine, please describe the technologies and measures you use to block CSAM from appearing in search results.

---

[24] *See* Evelyn Lopez, et al., The Gratifications of Ephemeral Marketing Content, the Use of Snapchat by the Millennial Generation and Their Impact on Purchase Motivation, GLOBAL BUSINESS REVIEW (2021), https://journals.sagepub.com/doi/pdf/10.1177/09721509211005676.

[25]  *See id.*

[26] *Letter to Sundar Pichai and 36 other Tech Companies by Senate Committee* (November 18, 2019),  https://www.blumenthal.senate.gov/imo/media/doc/11.18.19%20-%20Google%20-%20CSAM.pdf  (last accessed Aug. 25, 2022).

114.     In July 2020, ParentsTogether, a national parent group, delivered a petition from 100,000 parents to Snap demanding that the company do more to "protect children from sexual abuse and exploitation" on Snapchat.

115.     The petition listed numerous examples of widespread online sexual grooming of children including:

   a.   A high school coach in New Mexico used Snapchat to extort sexual videos from several girls as young as 14.

   b.   A Cleveland man posed as a therapist and blackmailed a 13-year-old girl into sending him sexual videos and photos.

   c.   A Virginia man was arrested for running a "sextortion" ring on Snapchat, coercing children into sending sexually explicit material.

116.     In response, Snap announced that it would deploy technology in addition to Microsoft's PhotoDNA to help stop the spread of CSAM by its product by Fall 2020.[27]

117.     While Snap utilizes Photo DNA as of 2020, its failure to do so up until that date caused D.H. and other minors grave harms as its products contributed to child exploitation and the spread of CSAM.

118.     Snap products do not have any feature to allow users to specifically report CSAM, even though doing so would facilitate the interdiction of CSAM and help limit child exploitation and the spread of CSAM through its products.[28]

---

[27] Our Transparency Report for the First Half of 2021, SNAP INC. (Nov. 22, 2021), https://snap.com/en-US/safety-and-impact/post/our-transparency-report-for-the-first-half-of-2021.
[28] *Id*. at 10.

119.    Moreover, even by detecting CSAM that is known and identified, social media companies like Snap—which operate at major scale with "billions of daily uploads"—may prioritize factors like "efficiency" (*i.e.*, cost and scalability) and "distinctness" (*i.e.*, more specificity) while compromising other factors like "tolerance" (*i.e.*, less specificity) of the detection model, potentially resulting in underreporting of actual incidents of CSAM within its product.[29]

120.    Snap apparently fails to utilize other freely available and industry proven child protection tools such as Project Arachnid Shield to safely design their products and prevent child exploitation and the distribution of CSAM through their products.

121.    Snap does not allow users to specifically report CSAM even though doing so would facilitate the interdiction of CSAM and help limit the spread of CSAM through its products.[30]

122.    Snap states that it is using "technology to identify *known* illegal images and videos of CSAM and report them to NCMEC." Snap does not address its role specific to the design of its products that contribute to the massive spread of new and un-hashed un-identified CSAM, nor do any other Defendants.[31]

---

[29] *See* Hany Farid, An Overview of Perceptual Hashing, Journal of Online Trust and Safety (October 2021) at 10, Stanford Internet Observatory, https://tsjournal.org/index.php/jots/article/download/24/14 "In practice, the choice of a hash is based on a number of factors, including: 1. Scale. When operating at the scale of a major social media platform, for example, with billions of daily uploads, any hash must be highly efficient and distinct. At this scale, even a 1/100 or even 1/10,000 false positive rate (incorrectly matching two images) is untenable. 2. Tolerance. When trying to limit the upload of, for example, legal adult pornography, resilience may be less important than, for example, trying to limit child sexual abuse imagery."
[30] *Id.*, at 10.
[31] NCMEC, Google and Image Hashing Technology, GOOGLE, https://safety.google/intl/en_nz/stories/hash-matching-to-help-ncmec/ (accessed on March 28, 2022); Our Transparency Report for the First Half of 2021, SNAP INC. (Nov. 22, 2021), https://snap.com/en-US/safety-and-impact/post/our-transparency-report-for-the-first-half-of-2021.

123.    Moreover, even by detecting CSAM that is known and identified, social media companies like Snap—which operate at major scale with "billions of daily uploads"—may prioritize factors like "efficiency" (*i.e.*, cost and scalability) and "distinctness" (*i.e.*, more specificity) while compromising other factors like "tolerance" (*i.e.*, less specificity) of the detection model, potentially resulting in underreporting of actual incidents of CSAM within its product.[32]

124.    Snap collects troves of information and data from its users.[33] According to Snap, users "provide us whatever information you send through our services, such as Snaps and Chats."[34]

125.    Information Snap obtains when users access their services include the following: (1) usage information (how the user communicates with other users, such as their names, the time and date of any communications);[35] (2) content information (whether the user viewed content, and meta data "information about a Snap and Chat such as the date, time, sender, and receiver.");[36] (3) device information; (4) device phonebook; (5) camera and photos; (6) precise location

---

[32] *See* Hany Farid, An Overview of Perceptual Hashing, Journal of Online Trust and Safety (October 2021) at 10, Stanford Internet Observatory, https://tsjournal.org/index.php/jots/article/download/24/14   "In practice, the choice of a hash is based on a number of factors, including: 1. Scale. When operating at the scale of a major social media platform, for example, with billions of daily uploads, any hash must be highly efficient and distinct. At this scale, even a 1/100 or even 1/10,000 false positive rate (incorrectly matching two images) is untenable. 2. Tolerance. When trying to limit the upload of, for example, legal adult pornography, resilience may be less important than, for example, trying to limit child sexual abuse imagery."

[33] Snap uses information it collects for many different purposes, including to "provide and improve our advertising services, ad targeting, and ad measurement, including through the use of your precise location information (again, if you've given us permission to collect that information), both on and off our services." Snap Inc., Privacy Policy, SNAP INC. (Nov. 17, 2021), https://www.snap.com/en-US/privacy/privacy-policy.

[34] *Id.*

[35] Snapchat Support: Snap and Chat Metadata, SNAP INC., https://support.snapchat.com/en-US/article/snap-chat-metadata

[36] *Id.*

information; (7) information collected by cookies and other technologies; and (8) log information.[37]

126.    Snap claims to use this information for a variety of purposes, including to: (1) "enhance the safety and security of our products and services"; (2) "verify your identity and prevent fraud or other unauthorized or illegal activity"; and (3) "enforce, investigate, and report conduct violating our Terms of Service and other usage policies," respond to requests from law enforcement, and comply with legal requirements.[38]

127.    18 U.S.C. § 2258A mandates that Snap report suspected CSAM to NCEMC. The troves of data and information about its users that Snap collects should enable Snap to detect, report as legally required, and take actions to prevent instances of sexual grooming and CSAM distribution, but Snap has failed to do so. Yet, Snap continues to make false representations that "[they] report all instances of child sexual exploitation to authorities." This is not true.

128.    The following is on Snapchat's Community Guidelines that outline the Terms of Service:

> The key is the spirit of these rules: we want Snapchat to be a safe and positive experience for everyone. We reserve the right to decide, in our sole discretion, what content violates that spirit and will not be permitted on the platform.
>
> ***Sexually Explicit Content***
>
> We prohibit accounts that promote or distribute pornographic content. We report all instances of child sexual exploitation to authorities. Never post, save, or send nude or sexually explicit content involving anyone under the age of 18—even of yourself. Never ask a minor to send sexually explicit content.

129.    According to their Terms of Service in place on September 26, 2017, February 18, 2019, and from October 30, 2019 until September 30, 2021, Snap clearly gives themselves

---

[37] *Id.*

[38] *Privacy Policy*, SNAP INC. (Nov. 17, 2021), https://www.snap.com/en-US/privacy/privacy-policy.

permission to monitor, filter, and moderate user content at "any time for any reasons." Snap's Terms of Service declares, "[w]hile we're not required to do so, we may access, review, screen, and delete your content at any time and for any reason, including to provide and develop the Services or if we think your content violates these Terms.[39]

130.    Snap wields a great deal of discretion, specifically with respect to moderating, screening, and deleting user content. Snap's purported justification for collecting valuable user data is to enhance security, detect illegal activity, and enforce community guidelines against violators. But contrary to their representation, Snap's goal of collecting user data is not for user security and protection from illegal activities. Instead, Snap collects user data for advertisement purposes which it openly profits from while many of its users are exposed to unsafe and unprotected conditions while using its product. Snap also collects user data which translates into profit in consideration for (which is legal contract speak for "trading value for") access to its product.[40]

131.    Snap gains revenue for every daily user on the Snapchat product in North America. Each user and their data is worth income and Snapchat benefits financially from users who access its product, including predators who commit sexual abuse against children and/or share CSAM.

---

[39] https://snap.com/en-US/terms (versions September 26, 2017, February 18, 2019, and October 30, 2019).

[40] *See* Opp. To Motion to Dismiss by Plaintiffs' attorney, Lee Davis in BAILEY ZIENCIK, ET AL.'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO SNAP, INC'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT, Case No.: 2:21-cv-7292-DMG-PD (C.D.Cal) Doc 50-1 (11/19/21).

**Defendants' Defective Products Facilitate the Worldwide Online**

**Child Sexual Exploitation Crisis While Defendants' Profit from It**

132.   At all relevant times, Defendants knew that child predators used Defendants' social media products to recruit and exploit children to create CSAM that is then distributed using Defendants' products.

133.   CSAM is illegal contraband that is not protected by the First Amendment and Defendants know that it exists and is created and distributed through their social media products. Despite their knowledge, Defendants continue to facilitate and profit from CSAM which is completely unprotected speech and broadly illegal and strictly prohibited in most jurisdictions worldwide. *New York v. Ferber*, 458 U.S. 747, 759 (1982).

134.   Similarly, "[t]he unlawful conduct of everyone who reproduces, distributes, or possesses the images of the victim's abuse…plays a part in sustaining and aggravating this tragedy." *Paroline v. United States*, 572 U.S. 434, 457 (2014).

135.   Defendants designed their social media products with the knowledge that their non–neutral algorithms would attract, enable, and facilitate child predators' recruitment of unsuspecting child users as well as allowing like-minded predators to organize and concentrate their nefarious efforts through affinity groups and communication products.

136.   Defendants knew or should have known that the longer their child users remain engaged with their social media products, the higher the risk that child predators will target those child users to sexually exploit them for CSAM.

137.   Despite this knowledge, and without regard to user safety—especially to vulnerable child users—Defendants purposefully designed their social media products and their complex non–neutral algorithms to maximize profits in the form of increased user engagement and advertising impressions. As such, Defendants' designs deliberately increased the risk that

their child users, many under age thirteen, will be targeted by child predators for sexual exploitation and CSAM.

138.    Further, despite knowing the prevalence and dangers of child predators that target child users of Defendants' products, Defendants did not adequately warn child users or their parents of these known dangers lurking within their products.

**Plaintiff D.H. Develops a Social Media Dependency and Obsessive Compulsions Soon after First Accessing Facebook, Instagram, and Snapchat**

139.    On or about 2010 to 2011, Plaintiff D.H., used a computer and created her first Facebook.com profile page when she was approximately ten or eleven years old.

140.    Despite the requirements under COPAA, Facebook did not obtain verifiable parental consent and did not notify or sufficiently warn D.H.'s parents that they were collecting information about D.H. on their product without parental consent.

141.    D.H. used her legal first name and last name on her Facebook profile and added a picture of herself to her profile page.

142.    D.H. began adding other Facebook users as "friends" and soon became fixated with increasing the number of friends on her Facebook friends list because adding more people made her feel popular and more connected in the Facebook universe.

143.    D.H. quickly began using Facebook daily and started checking her Facebook notifications on her cellphone at every possible opportunity.

144.    On or about 2012 to 2013, when D.H. was approximately twelve to thirteen years old she used her cellphone to create her first Instagram account.

145.    Instagram did not secure verifiable parental consent and did not notify or sufficiently warn D.H.'s parents that they were collecting information about D.H. on their product without parental consent.

146.    D.H. continued to post photographs of herself on Facebook as well as on Instagram.

147.    Thousands of strangers began to interact with D.H. online and encourage her to reveal private information about herself. She eventually complied.

148.    D.H. often checked her social media accounts throughout the night and developed severe insomnia.

149.    D.H. quickly became severely dependent on social media engagement and began using Facebook and Instagram every day for extended periods of time.

150.    D.H. ultimately became addicted to and obsessed with social media and preferred to interact online rather than in person. D.H. eventually stopped attending school as she became too preoccupied with social media to focus on her coursework.

151.    D.H. began to feel that her privacy was constantly being invaded online and that she was powerless to stop it, which resulted in her feeling depressed.

152.    D.H. began using drugs and alcohol to cope with the constant feelings of invasion, shame, and resentment that accompanied her near constant social media use.

**D.H. Becomes A Victim of Online Child Sexual Exploitation**

153.    On or about 2013, when D.H. was approximately thirteen years old, she interacted with a stranger on Facebook who was approximately thirty years old. He invited her to his birthday party using Facebook Messenger as well as other means of communication. She attended this stranger's party, was provided alcohol, and was raped.

154.    Around the same time, strangers on Instagram began interacting with D.H. in a sexually explicit manner via direct messages on Instagram and began offering her money to provide them with sexually explicit material depicting herself.

155.    D.H. eventually complied with these constant demands and requests for her to send sexually explicit material to strangers she met on Meta's products.

156.    Much of the sexually explicit material D.H. provided depicted her masturbating her naked genitals and/or massaging or touching her naked breasts or buttocks.

157.    D.H. continued to use Instagram to send images depicting her naked body and touching her genitals, breasts, and buttocks to strangers upon their request. D.H. eventually built up a substantial following of strangers that paid her for providing them with CSAM depicting her.

158.    On or about 2014, when she was approximately fourteen years old, D.H. created a Snapchat Premium account and another social media account as a way to further connect with Facebook and Instagram users.

159.    In exchange for money sent via online payment services, D.H. provided many of the same individuals that interacted with her on Facebook and/or Instagram with exclusive access to live videos of her engaging in sexual conduct such as masturbation and sexual posing using Snapchat Premium.

160.    On or about 2015, when she was approximately fifteen years old, D.H. created another social media account as a way to provide her followers on Facebook, Instagram, and Snapchat with additional "live stream" content of her engaging in sexually explicit behavior.

161.    D.H. received tens of thousands of dollars for providing CSAM depicting her to strangers that contacted her while she was a child on Instagram, Snapchat Premium, and other social media accounts.

162.    When D.H. was a child, she shared thousands of images and videos of herself engaging in sexually explicit behavior due to the psychological torment and harm Defendants products caused her.

163.    In her early teens, D.H. began feeling paranoid about how many strangers she met online who could potentially locate her or her CSAM and threaten her or her family.

164.    In fact, on at least five separate occasions, individuals attempted to extort money or additional CSAM images from D.H. by threatening to expose her CSAM images to her "friends" on Facebook and Instagram, which included her personal friends and family members.

165.    On at least one occasion, when D.H. was approximately fourteen or fifteen years old, an individual texted images and videos of D.H. engaging in sexually explicit activity to D.H.'s immediate and extended family members.

166.    Soon after, D.H. disclosed her social media activity to her parents and reported these online threats to local law enforcement in her hometown who were unable to locate the individual who had threatened D.H. online.

167.    Around this time, D.H. disclosed her feelings of depression and anxiety to her parents, and she first sought inpatient and outpatient mental health treatment starting at the approximate age of fourteen or fifteen.

168.    D.H. remains depressed, obsessed with social media, dependent on online engagement for happiness, overwhelmed by social anxiety, and filled with shame from activities on social media that began when she was ten or eleven years old.

169.    Defendants' products each caused the development of D.H.'s social media dependency and the vast online distribution and reproduction of CSAM depicting D.H.

170.    Defendants' products each facilitated the ability of online predators to access D.H. and her personally identifiable information.

171.    Defendants' products allowed predators to capture and save images and videos of D.H. that will forever memorialize D.H.'s child sex abuse performances.

- 38 -
COMPLAINT

1
2
3
4
5
6
7
8
9

172.    In approximately 2020, D.H. received a direct message on Instagram informing her that CSAM of her from when she was thirteen years old was being shared in various online chatrooms and blogs.

173.    D.H. remains obsessed with trying to control the online distribution of her CSAM and to this day spends an extensive amount of time trying to track down and report her CSAM as it spreads via Defendants' products, as well as other online products.

174.    Defendants make it difficult if not impossible for users to report CSAM on their social media products.[41]

10
11
12

**Defendants Engaged in the Foregoing Acts Without Ever Obtaining Verifiable Parental Consent from D.H.'s Parents and Without Ever Warning D.H. or her Parents of the Risks of Using its Products as a Child**

13
14
15
16
17

175.    Approximately four or five years after first using social media, when D.H. was approximately fourteen or fifteen years old, D.H. informed her parents about her social media use and was hospitalized for psychological distress related to the shame and psychological injury Defendants' defective products caused her. D.H. continues to seek psychological treatment.

18
19
20

176.    Approximately four or five years after first using social media, when D.H. was approximately fourteen or fifteen years old, D.H. reported an online threat she received on Instagram to law enforcement.

21
22

177.    Defendants' products enabled the collection, use, and disclosure of D.H.'s personally identifiable information and viewing data without notifying her parents.

23
24
25

178.    Defendants never obtained verifiable parental consent to collect, use, or disclose D.H.'s personally identifiable information or viewing data.

26
27
28

---

[41] *See* note 13, *supra.*

179.     D.H. and her parents never knew that her personally identifiable information and viewing data could be collected, disclosed, or used by Defendants' products, because at all times Defendants failed to provide D.H.'s parents with any of the required disclosures, never sought verifiable parental consent, and never provided any mechanism by which D.H's parents could provide verifiable consent.

180.     Defendants' unlawful collection of D.H.'s personally identifiable information and viewing information for commercial gain exposed D.H. and others like her to online child predators.

**Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of any Content Provided, Posted, or Created by Third Parties**

181.     D.H is not alleging that Defendants are liable for any third-parties acts, but solely for what Defendants did or did not do.

182.     D.H.'s claims seek to hold Defendants accountable for their own wrongful acts and omissions. D.H.'s claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, as well as Defendants' own statements and affirmative acts or omissions, not as the speaker or publisher of third-party content.[42]

183.     D.H. further alleges that Defendants failed to adequately warn child users and their parents of known dangers arising from anticipated use of their social media products. None of D.H.'s claims rely on treating Defendants as the publisher or speaker of any third-party's words.

184.     None of D.H.'s claims for relief require treating Defendants as a speaker or publisher of content posted by third parties. Rather, D.H. seeks to hold Defendants liable for their

---

[42] The CDA does not immunize an interactive computer service provider that creates or develops the harm. *See e-ventures Worldwide, LLC v. Google, Inc.*, No. 214CV646FTMPAMCM, 2017 WL 2210029, at *3 (M.D. Fla. Feb. 8, 2017) citing *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, at 1162 (9th Cir. 2008).

own speech and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products.

185.    Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products without altering, deleting, or modifying the content of a single third-party post or communication.

## CLAIMS FOR RELIEF

## COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

186.    Plaintiff realleges each and every allegation above and below as if fully stated herein.

187.    Under Restatement (Second) of Torts § 402(a), California, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

188.    At all relevant times, the Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products that Plaintiff used.

189.    Defendants designed, manufactured, marketed, and sold products that were unreasonably dangerous because they were designed to be addictive and detrimental to the mental health of children to whom the Defendants knowingly marketed their products.

190.    Defendants' products were unreasonably dangerous because they contained numerous design characteristics that were not necessary for the utility provided to the user but were unreasonably dangerous and implemented by Defendants solely to increase the profits they derived from each additional user.

191.     At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products that Plaintiff used, which are defective and unreasonably dangerous.

192.     Defendants' products were designed and intended to be used as social media products. Defendants' social media products are defective in their design in that they are not reasonably fit, suitable or safe for their intended purpose, especially as related to adolescent users, and/or their foreseeable risks exceed the benefits associated with their design.

193.     The defective condition of Defendants' social media products rendered them unreasonably dangerous and/or not reasonably safe, and Defendants' social media products were in this defective condition when they were released to the public. Defendants' social media products, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, increased risky behavior, exposure to child predators, sexual exploitation, among other harmful effects.

194.     Defendants' social media products were expected to and did reach Plaintiff without substantial change in the condition in which they were signed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

195.     Defendants' social media products were used for their intended purposes, and the products were not materially altered or modified prior to their use.

196.    Defendants defectively designed the products to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the products, and particularly susceptible to harms from those products.

197.    Defendants effectively designed the products to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

198.    Defendants defectively designed social media products that are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (i.e., photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the product which are currently unknown and hidden from users and governments.

199.    Defendants defectively designed their products, and Defendants failed to test the safety of features they developed and implemented for use in their products. Once Defendants did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff or her parents.

200.    Defendants' social media products do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Defendants' social media products pose a risk of serious mental and physical health injuries as listed above.

201.    The risks inherent in the design of Defendants' social media products significantly outweigh any benefits of such design.

202.    Defendants could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

203.    Defendants could have limited the duration of login sessions to prevent harmful, extended use of the products and could have designed the products to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time. Instead, Defendants designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff

204.    Defendants also engage in harmful conduct, outside of the non–neutral algorithms themselves, which is designed to prioritize the repeated and endless display of harmful and exploitative content as a means of increasing their revenue from advertisements. This includes, but is not limited to, efforts to encourage advertisers to design ads that appeal to minors, including children under the age of 13; and product design features intended to attract and engage minor users to these virtual spaces where harmful advertising content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user well-being.

205.    Reasonable minor users and their parents would not expect that Defendants would intentionally and knowingly direct them to such harmful content, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their non–neutral algorithms on minor users in a manner designed to affirmatively change their behavior, which methods are particularly effective on and harmful to Defendants' youngest users.

206.    Defendants also defectively designed social media products that are inherently dangerous because they lacked adequate age verification, identity verification, and parental controls and monitoring capabilities.

207.    Defendants could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those under-aged from using the products, or other youth protecting features.

208.    Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only have the ability to estimate the age of their users, but actually do so, without attempting to mitigate the harms their social media products cause

209.    The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products

210.    Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

211.   Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and products.

212.   Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and products.

213.   Defendants could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

a.   Designing products that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media product;

b.   Default protective limits to length of use and frequency of use;

c.   Opt-in restrictions to length of use, frequency of use, or content types;

d.   Session time limits;

e.   Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.   Session time notifications, warnings, or reports;

g.   Warning of health effects of use and extended use upon sign-up;

h.   Parental controls;

i.   Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the product,

j.   Self-limiting tools;

k.   Implementing labels on images and videos that have been edited using tools provided by the product;

l.      Content-neutral Algorithms that do not intentionally increase
inflammatory, misleading, controversial, emotionally-weighted, or
negative content that Defendants know causes users to engage with the
social media products for a harmful length of time.

m.      Informational labelling about the misleading and unrealistic nature of the
content on a user's feed and the resulting feed composite because of
content editing and algorithmic recommendation, presentation, and
sorting;

n.      Informational labelling about the prevalence of child predators targeting
young children on Defendants' products;

o.      Chronological presentation of content rather than algorithmic; and many
other less harmful alternatives.

214.    Instead, Defendants designed products that aggressively addict users with non–
neutral algorithms and features that increase addictiveness, use time, frequency of use, attention
stealing, engagement with the product, mental health harms, and profit to Defendants, all to the
detriment of users' wellbeing.

215.    It is reasonable for parents to expect that social media products that actively
promote their products to minors will undertake reasonable efforts to notify parents when their
child's use becomes excessive, occurs during sleep time, or exposes the child to predators and
distribution of CSAM depicting them or other children. Defendants could feasibly design the
products to identify minor users who are using the product excessively, using it during sleeping
hours, or being exposed to child predators and CSAM, and notify their parents, at negligible cost.

216.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

217.    The collaboration of these features multiplies the products' power to inflict harm by heightening the products' addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, increasing exposure to child predators, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

218.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm to children is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Defendants' algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

219.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm, eating disorders, increasing risky behavior such as posting sexually

suggestive photos, connecting with child predators, and exchanging CSAM in inevitable failing efforts to feel more attractive or successful.

220.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the product to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

221.    Defendants failed to design the product with adequate warnings about the likely harms of use.

222.    Plaintiff used Defendants' social media products as intended or in reasonably foreseeable ways. Defendants specifically intended for minors to use its products and were aware that an increasingly large number of minors were doing so.  In fact, that was Defendants' intention.

223.    Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the products' design, marketing, and operation.

224.    Defendants' social media products were defective and unreasonably dangerous when they left Defendants' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

225.    Plaintiff was injured as a direct and proximate result of Defendants placement of the products into the stream of commerce, her use of the products as intended and designed, and the products' defective design as described herein.  Such harm includes social media compulsion and dependency, depression, severe anxiety, insomnia, substance abuse, sexual exploitation, distribution of her CSAM, and rape, among other harmful effects, among other harmful effects.

226.     The defective design of Defendants' social media products was the proximate cause of Plaintiff's harms.  Plaintiff suffered severe mental harm, leading to physical and mental injury, from her use of and exposure to Defendants' social media products. Plaintiff suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.  Plaintiff has suffered physical harm, emotional distress, past and future medical expenses, and pain and suffering.

227.     Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Plaintiff whom they knew would be seriously harmed using Defendants' social media products.

## COUNT II - STRICT PRODUCT LIABILITY (Failure to Warn)

228.     Plaintiff realleges each and every allegation above and below as if fully stated herein.

229.     At all relevant times, the Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products that Plaintiff used.

230.     Defendants' social media products rely on highly complex and proprietary non–neutral algorithms that are both undisclosed and unfathomable to ordinary consumers who do not expect that social media products are physically and/or psychologically addictive.

231.     The harms resulting from minors' addictive use of social media products have been not only well documented in the professional and scientific literature, but Meta had actual knowledge of such harms. On information and belief, Snap also has conducted internal studies documenting the addictive quality and harmful effects of its social media products on minor users.

232.    The magnitude of harm from addiction to Defendants' products is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, exchange of CSAM with child predators, self-harm, and suicide.

233.    Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen time is harmful to adolescents' mental health, sleep patterns, and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

234.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost. This would enable parents to track the frequency, time and duration of their minor child's social media use and identify and address problems arising from such use in the exercise of their rights and responsibilities as parents.

235.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the products reasonably safe during ordinary and foreseeable use by children.

236.    The Defendants knew or, by the exercise of reasonable care, should have known use of Defendants' social media products was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

237.    Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

Defendants' social media products. Defendants' social media products are highly addictive and likely to cause mental and physical injuries as listed above.

238.     Defendants knew or, by the exercise of reasonable care, should have known that Facebook and Instagram posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, increased risky behavior, exposure to child predators, sexual exploitation, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the products.

239.     Defendants owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Defendants' social media products.

240.     Defendants breached their duty of care by failing to use reasonable care in providing adequate warnings in the products' sign-up warnings, and through marketing, promoting, and advertising of the products.

241.     Defendant Meta's knew through its own research but failed to adequately warn that:

        a.     At least five-to-six percent of fourteen-year-olds admit to addiction to the product;

        b.     Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

        c.     Facebook makes body-image issues worse for one-third of girls;

d.  Thirteen-and-one-half percent of teen-girl Instagram users say the product makes thoughts of suicide and self-injury worse;

e.  Seventeen percent of teen-girl Instagram users say the product makes eating issues worse;

f.  Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

242.  Defendants' social medial products are also defective for failing to warn users that:

a.  Engagement-based ranking and intermittent variable rewards are:

    i.  highly addictive;

    ii.  promote harmful social comparison;

    iii.  promote negative, controversial, and/or emotionally activating content;

    iv.  promote negative, harmful, and/or dangerous interest groups and/or content creators;

    v.  encourage bullying and conflict;

    vi.  can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm;

    vii.  present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs), and;

    viii.  can increase the risk for minors to be targeted and sexually exploited by child predators.

b.  Face tracking and augmentation (image and video filters):

       i.   inflict unrealistic and biased beauty standards upon users;

      ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users, and;

    iii.   can increase the risk for minors to be targeted and sexually exploited by child predators;

c.   The products cause the mental and physical health harms as listed above;

d.   The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.   The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

f.   The likelihood and intensity of these harmful effects are increased by other features and inner-workings of the products which are currently publicly unknown and hidden from users and governments.

243.   The failure of Defendants to adequately warn about its defective products, and their efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the products.

244.   Through their incredible power as premier social media companies, Defendants have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their products.

245.   Rather than warning users of likely harms, Defendants regularly fine-tune the products to aggressively, socially, and psychologically engineer new non–neutral algorithms to

manipulate ongoing users to increase addiction and exposure to their products, causing and increasing physical and psychological harm. The products further encourage users to recruit more users across their personal electronic contacts.

246.    The failure of Defendants to adequately warn about its defective products— and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues— created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the products.

247.    At all relevant times, Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

248.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

249.    Plaintiff was injured as a direct and proximate result of Defendants' failure to warn and instruct because she would not have used Defendants' social media products had she received adequate warnings and instructions that the products could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, increased risky behavior, exposure to child predators, sexual exploitation, among other harmful effects.

250.    Defendants' lack of adequate and sufficient warnings and instructions, and their inadequate and misleading advertising, were proximate causes to the harms suffered by Plaintiff.

Plaintiff suffered severe mental harm, leading to physical and mental injury, from her use of and exposure to Defendants' social media products. Plaintiff suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.  Plaintiff has suffered physical harm, emotional distress, past and future medical expenses, and pain and suffering.

251.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Plaintiff whom they knew would be seriously harmed using Defendants' social media products.

## COUNT III – PRODUCT LIABILITY (Negligent Design)

252.    Plaintiff realleges each and every allegation above and below as if fully stated herein.

253.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products that Plaintiff used.

254.    Defendants' social media products were designed and intended to be used as social media products.

255.    Defendants knew or, by the exercise of reasonable care, should have known use of Defendants' social media products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

256.    Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' social media products. Defendants' social media products are highly addictive and likely to cause mental and physical injuries as listed above.

257.    Defendants owed a duty to all reasonably foreseeable users to design a safe product.

258.    Defendants breached their duty by failing to use reasonable care in the design of Defendants' social media products because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, increased risky behavior, exposure to child predators, sexual exploitation, among other harmful effects.

259.    Defendants breached their duty by failing to use reasonable care in the design of Defendants' social media products by negligently designing the products with physically and mentally harmful features as previously described herein.

260.    Defendants breached their duty by failing to use reasonable care in the design of Defendants' Social Media Products by negligently designing the products to specifically appeal to minors, who were particularly unable to appreciate the risks posed by the products.

261.    Defendants breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs as described herein that would make the product less addictive and harmful to minors.

262.    Defendants breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, Defendants designed products that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the product, mental health harms, and profit to Defendants, all to the detriment of users' wellbeing.

263.    Defendants breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the products, or other youth-protecting features.

264.    A reasonable company under the same or similar circumstances would have designed a safer product.

265.    Plaintiff was harmed directly and proximately by Defendants' failure to use reasonable care in the design of Defendants' social media products. Such harm includes social media compulsion and dependency, depression, severe anxiety, insomnia, substance abuse, sexual exploitation, distribution of her CSAM, and rape, among other harmful effects, among other harmful effects.

266.    As a result of Defendants' negligent design of their social media products, Plaintiff suffered severe mental harm, leading to physical and mental injury, from her use of and exposure to Defendants' social media products. Plaintiff suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.  Plaintiff has suffered physical harm, emotional distress, past and future medical expenses, and pain and suffering.

267.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Plaintiff whom they knew would be seriously harmed using Defendants' social media products.

## COUNT IV – PRODUCT LIABILITY (Negligent Failure to Warn)

268.    Plaintiff realleges each and every allegation above and below as if fully stated herein.

269.    At all relevant times, the Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products that Plaintiff used.

270.    Defendants knew or, by the exercise of reasonable care, should have known use of Defendants' social media products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

271.    Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff and her parents would not have realized the potential risks and dangers of Defendants' social media products. The products are highly addictive and likely to cause mental and physical injuries as described herein.

272.    Defendants knew or, by the exercise of reasonable care, should have known that Defendants' social media products posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, increased risky behavior, exposure to child predators, sexual exploitation, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the products.

273.    Defendants owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Defendants' social media products.

274.    Defendants breached their duty of care by failing to use reasonable care in providing adequate warnings, as previously described herein, in the products' sign-up warnings, and through marketing, promoting, and advertising of the products.

275.    The failure of Defendants to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the products.

276.    Through their incredible power as premier social media companies, Defendants have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their products.

277.    Rather than warning users of likely harms, Defendants regularly fine-tune the products to aggressively, socially, and psychologically engineer new non–neutral algorithms to manipulate ongoing users to increase addiction and exposure to their products, causing and increasing physical and psychological harm. The products further encourage users to recruit more users across their personal electronic contacts.

278.    The failure of Defendants to adequately warn about its defective products— and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues— created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the products.

279.    At all relevant times, Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

280.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

281.    Plaintiff was injured as a direct and proximate result of Defendants' failure to warn and instruct because she would not have used Defendants' social media products had she received adequate warnings and instructions that the products could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, increased risky behavior, exposure to child predators, sexual exploitation, among other harmful effects.

282.    Defendants' negligent failure to provide adequate and sufficient warnings and instructions, and their inadequate and misleading advertising, were proximate causes to the harms suffered by Plaintiff.  Plaintiff suffered severe mental harm, leading to physical and mental injury, from her use of and exposure to Defendants' social media products. Plaintiff suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.  Plaintiff has suffered physical harm, emotional distress, past and future medical expenses, and pain and suffering.

283.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Plaintiff whom they knew would be seriously harmed using Defendants' social media products.

## COUNT V – NEGLIGENCE AND/OR GROSS NEGLIGENCE (Common Law)

284.    Plaintiff realleges each and every allegation above and below as if fully stated herein.

285.    At all relevant times, the Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products that Plaintiff used.

286.    At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such as Plaintiff.

287.    Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.  Defendants intentionally designed and marketed their social media products to be both attractive and harmful to underage users, sometimes referred to as an "attractive nuisance." Rather than take reasonable precautions to prevent children from harmful and problematic behaviors, Defendant intentionally designed its products to attract and addict vulnerable child users.

288.    As California product manufacturers marketing and selling products to residents across the country and the world, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

289.    As business owners, Defendants owe their users—who use Defendants' social media products and from whom Defendants derive billions of dollars per year in advertising revenue—a duty of ordinary care substantially similar to that owed by physical business owners to their business invitees. Defendant Meta has acknowledged that it considers itself to be a digital

premises owner by changing its name to Meta, in reference to the "metaverse," and likening its products to physical places where it intends for its users to visit for Meta's financial gain.

290.    Defendants breached their duty of care by failing to exercise ordinary care and caution for the safety of underage users, like Plaintiff, using their Facebook, Instagram, and Snapchat products.

291.    Defendants breached their duty of care by failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst minor users. Defendants' have extensive internal research indicating that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

292.    Defendants breached their duty of care by failing to fully assess, investigate, and restrict the use of Defendants' social media products by child predators to sexually solicit, abuse, manipulate, and exploit minor users.

293.    Defendants breached their duty of care by failing to provide users and parents the tools to ensure their social media products were used in a limited and safe manner by underage users.

294.    As a result of Defendants' negligence, gross negligence, recklessness and/or carelessness, Plaintiff suffered severe mental harm, leading to physical and mental injury, from her use of and exposure to Defendants' social media products. Plaintiff suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.  Plaintiff has suffered physical harm, emotional distress, past and future medical expenses, and pain and suffering.

295.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Plaintiff whom they knew would be seriously harmed using Defendants' social media products.

## COUNT VI- NEGLIGENCE PER SE

296.    Plaintiff realleges each and every allegation above and below as if fully stated herein.

297.    At all relevant times, the Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products that Plaintiff used.

298.    At all times, Defendants had an obligation to comply with applicable statutes and regulations, including COPPA.

299.    Defendants' actions as described herein violated applicable statutes and regulations, including but not limited to 15 U.S.C.A. § 6501-5, 18 U.S.C. 2258A, and other federal criminal laws, including 18 U.S.C. 2255 and 1595.

300.    Specifically, Defendants violated 15 U.S.C.A. § 6501-5 by allowing users under age thirteen to use their products and by collecting personal information from minor users without obtaining verifiable parental consent, and promoting, advertising, and profiting from the distribution of illegal CSAM within their products.

301.    Defendants also violated 18 U.S.C. 2258A by not reporting to NCMEC the CSAM that they suspected to be in existence within their products. Specifically, Defendants designed their products in an attempt to limit and avoid their reporting requirements under this statute.

302.    Plaintiff is within the class of persons that these statutes and regulations are intended to protect.

303.   Plaintiff's injuries and/or symptoms are the type of harm that these statutes and regulations are intended to prevent.

304.   Defendants' violations of the foregoing statutes and regulations, among others, constitutes negligence per se.

305.   As a direct and proximate result of Defendants' statutory and regulatory violations, Plaintiff suffered serious injuries and/or sequelae thereto, including but not limited to emotional distress, diagnosed mental health conditions, loss of income and earning capacity, reputational harm, physical harm, past and future medical expenses, and pain and suffering.

306.   As a direct and proximate result of Defendants' statutory and regulatory violations, Plaintiff require and/or will require more healthcare and services and did incur medical, health, incidental, and related expenses.

307.   Plaintiff may also require additional medical and/or hospital care, attention, and services in the future.

308.   As a result of Defendants' negligence per se, Plaintiff suffered severe mental harm, leading to physical and mental injury, from her use of and exposure to Defendants' social media products. Plaintiff suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.  Plaintiff has suffered physical harm, emotional distress, past and future medical expenses, and pain and suffering.

309.   Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Plaintiff whom they knew would be seriously harmed using Defendants' social media products.

## COUNT VII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

310. Plaintiff realleges each and every allegation above and below as if fully stated herein.

311. At all relevant times, the Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products that Plaintiff used.

312. Defendants knew or should have known through the exercise of reasonable care, the risks posed to consumers, especially to minors, by Defendants' social media products and their features.

313. Defendants knew or should have known through the exercise of reasonable care, that minors and young people would be attracted to Defendants' products.

314. Defendants knew or, by the exercise of reasonable care, should have known that use of Defendants' social media products was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

315. Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' social media products.

316. Defendants knew or, by the exercise of reasonable care, should have known that Defendants' social media products posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, increased risky behavior, exposure to child predators, sexual exploitation, among other

harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the products.

317.    Defendants knew or should have known that Defendants' social media products needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

318.    Defendants knew or should have known that Defendants' social media products could cause serious harm, including severe emotional distress, particularly to young persons and minors.

319.    Defendants knew or should have known that many of the youth who were encouraged to use Defendants' social media products had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described products, which misrepresented the mental health effects of the products and failed to warn of the products' features' impacts and risks.

320.    Defendants were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

321.    Defendants' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

322.    Defendants acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

323.    Based on their strategic and intentional promotion, advertising, and marketing history, Defendants reasonably should have foreseen that young people would try Defendants' social media products and quickly become addicted to those products, resulting in teenagers and young adults being sexually exploited and developing emotional distress, mental health issues, and physical harm.

324.    Defendants were aware of the risks their products posed, as listed herein. After fine-tuning the products to be addictive, attention-grabbing, and attention-holding, Defendants reasonably should have foreseen the emotional distress and mental and physical issues this would cause on the individuals who would get obsessed, addicted, and sexually exploited, as well the stress this would place on their loved ones around them. Particularly, Defendants should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

325.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein.

326.    Defendants' conduct, as described above, was intentional, reckless, wanton, malicious, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers. As a result, Plaintiff suffered severe mental harm, leading to physical and mental injury, from her use of and exposure to Defendants' social media products. Plaintiff suffered serious damages in the form of emotional distress, diagnosed mental health

conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm. Plaintiff has suffered physical harm, emotional distress, past and future medical expenses, and pain and suffering.

327.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Plaintiff whom they knew would be seriously harmed using Defendants' social media products.

## COUNT VIII – VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONAL CODE §§17200 & 17500 ("UCL & FALSE ADVERTISING")

328.    Plaintiff realleges each and every allegation above and below as if fully stated herein.

329.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Defendants' social media products and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

330.    California Business and False Advertising laws prohibit unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by California. Bus. & Prof. Code §§17200 and 17500 et seq.

331.    Defendants engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including Plaintiff, while concealing critical information regarding the defective nature of their products, the risk of the addictive nature of their products, the risk of being sexually exploited as minor as a result of using these products, among other risks of harm these products pose. Defendants knew and should have known that their statements and omissions regarding the harmful nature of their products were misleading and therefore likely to deceive the members of the public who use Defendants' products and who

permit their underage children to use Defendants' products. Had Plaintiff's parents been properly informed of the dangerous nature of Defendants' products, they would have taken early and aggressive steps to stop or limit Plaintiff's use of Defendants' products.

332.    Further, Defendants designed products that encouraged sexual exploitation of children, yet Defendants declared publicly that their products contained systems to counter and prevent sexual exploitation and CSAM. Defendants designed products to frustrate and avoid their legal duty to report said CSAM.  Through their social media products, Defendants continue to enable predators to sexually exploit minors in exchange for financial gain as articulated in allegations set forth in this Complaint. A reasonable user would have relied on Defendants' misrepresentation to the user's detriment. Plaintiff, in fact, did rely on Defendants' misrepresentations to her detriment.

333.    Defendants also explicitly represent that they collect various user data for purposes of enhancing security and to provide protection of users from actions that violate Defendants' community guidelines but instead, Defendants use the various user data for advertisement profit and other revenue generation.

334.    Defendants' business activities are unfair, deceptive, and violate the UCL. They offend established public policy. The harm Defendants' business activities cause to consumers greatly outweighs any benefits associated with them.

335.    Defendants' conduct has resulted in a substantial injury that Plaintiff could not reasonably have avoided because of Defendants' deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

336.    As a direct and proximate result of the foregoing acts and activities, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described in herein.

337.    As a result of Defendants' UCL violations, Plaintiff suffered an injury in fact and lost money as set forth above and detailed in her prayer for relief.

338.    Pursuant to Cal. Bus. & Prof. Code §17200 and 17500 et seq., Plaintiff seeks an order for restitution and disgorgement.

## COUNT IX –FRAUDULENT CONCEALMENT

339.    Plaintiff realleges each and every allegation above and below as if fully stated herein.

340.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Defendants' social media products and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

341.    Defendants had a duty to disclose material facts as described herein about Defendants' social media products to Plaintiff and her parents.

342.    Defendants fraudulently and deceptively marketed Defendants' social media products to Plaintiff and her parents as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when Defendants knew it to be untrue.

343.    Defendants fraudulently and deceptively downplayed or minimized any risk associated with its products and product features as described herein. Defendants and others worked together to pitch news stories or other media content as described herein designed to downplay the risks of its products, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the

public, to initiate new users, to keep customers using Defendants' social media products, and to avoid regulation or legislative efforts to control Defendants' social media products.

344.   Through their incredible power as premier social media companies, Defendants have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their products as described herein.

345.   Defendants fraudulently and deceptively concealed that Defendants' social media products can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, increased risky behavior, exposure to child predators, sexual exploitation, among other harms.

346.   Defendants fraudulently and deceptively concealed that they had not adequately researched or tested the products and their features to assess their safety before offering them on the market and promoting them to young people and adults.

347.   Defendants fraudulently and deceptively concealed that the products were powerfully addictive.

348.   Defendants further fraudulently and deceptively concealed that the products are designed to create and sustain an addiction. Defendants also manipulated their products' non–neutral algorithms and features in ways that could and would impact their addictiveness and mental health impact, and Defendants did so while concealing this information from Plaintiff and her parents. Defendants actively concealed the inner-workings of their products and their mental health impacts as described herein.

349.    Each misrepresentation and/or omission made by Defendants as described herein was material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and her parents as to whether to register or use the products.

350.    Defendants had a duty to accurately provide this information to Plaintiff. In concealing this information from Plaintiff, Defendants breached their duty. Defendants also gained financially from this concealment, and because of their breach.

351.    Defendants had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, products, and on other social media. Defendants concealed material information at all relevant times as described herein, through today. Defendants have yet to disclose the truth about Defendants' social media products.

352.    Neither Plaintiff nor her parents were aware or could have been made aware of the material facts described herein that Defendants concealed. Plaintiff first discovered the truth regarding the causal connection between her injuries and the defective design of Defendants' social media products sometime after Frances Haugen's identity, along with her leaked documents, were revealed in October 2021.

353.    Defendants intended to deceive Plaintiff and the public at large by concealing all of the material facts as described herein.  Defendants did, in fact, deceive and intentionally prevented Plaintiff and her parents from discovering the design defects and the resulting harms of Defendants' social media products.

354.    Plaintiff relied to her detriment on Defendants' fraudulent statements and omissions as described herein. Had Plaintiff been adequately informed of the material facts concealed from

her regarding the safety of the products, and not intentionally deceived by Defendants, she and her parents would not have signed up for or used Defendants' social media products.

355.    Defendants' fraudulent concealment was a direct and proximate cause of Plaintiff's harms as described herein, including: social media compulsion and dependency, depression, severe anxiety, insomnia, substance abuse, sexual exploitation, distribution of her CSAM, and rape, among other harmful effects, which may cause or contribute to additional disease.

356.    As a result of Defendants' fraudulent concealment, Plaintiff suffered severe mental harm, leading to physical and mental injury, from her use of and exposure to Defendants' social media products. Plaintiff suffered serious damages in the form of emotional distress, diagnosed mental health conditions, medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm.  Plaintiff has suffered physical harm, emotional distress, past and future medical expenses, and pain and suffering.

357.    Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton conduct toward underage users, including Plaintiff whom they knew would be seriously harmed using Defendants' social media products.

## TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

358.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Defendants caused her injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

359.    Plaintiff did not suspect and had no reason to suspect Defendants caused her injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

360.    In addition, Defendants' fraudulent concealment tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, Defendants actively

concealed from Plaintiff the risks associated with the defects of Defendants' social media products and that these products caused her injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, Defendants committed continual tortious, and fraudulent acts that continue to this day.

361.    As a result of Defendants' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that she had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

## **RELIEF REQUESTED**

362.    **WHEREFORE**, the Plaintiff requests judgment against the Defendants as follows:

363.    Plaintiff prays for judgment against Defendants for relief as follows:

364.    Past physical and mental pain and suffering of Plaintiffs, in an amount to be more readily ascertained at the time and place set for trial;

365.    Loss of enjoyment of life, in an amount to be more readily ascertained at the time and place set for trial;

366.    Past medical care expenses for the care and treatment of the injuries sustained by Plaintiff in an amount to be more readily ascertained at the time and place set for trial.

367.    Past and future impairment to capacity to perform everyday activities;

368.    Plaintiff's pecuniary losses;

369.    Loss of future income and earning capacity of Plaintiff;

370.    Punitive damages;

371.    Reasonable costs and attorney and expert/consultant fees incurred in prosecuting this action; and

372.    Pre-judgment and post-judgment interest;

1  373.    Such other and further relief as the Court deems just and proper.

2  <center>**DEMAND FOR JURY TRIAL**</center>

3  374.    Plaintiffs demand a trial by jury.

4
Respectfully submitted,

5  DATED this 26th day of August, 2022

6  **Aylstock, Witkin, Kreis & Overholtz, PLLC**

7

8  S. Mary Liu (CA SBN 282884)

9  17 East Main Street, Suite 200
Pensacola, FL 32502

10  Tel: (850) 202-1010
Fax: (760) 304-8933

11  Email: mliu@awkolaw.com

12  **Hach Rose Schirripa & Cheverie LLP**
Hillary Nappi (*pro hac vice* to *be filed*)

13  Frank R. Schirripa (*pro hac vice to be filed*)
112 Madison Avenue, 10th Fl.

14  New York, NY 10016
Tel : (212) 213-8311

15  Fax : (212) 779-0028
Email: hnappi@hrsclaw.com

16  　　　　fschirripa@hrsclaw.com

17  **Marsh Law Firm PLLC**
Margaret E. Mabie, (*pro hac vice to be filed*)

18  James R. Marsh (*pro hac vice to be filed*)
Marsh Law Firm PLLC

19  31 Hudson Yards, 11th Fl
New York, NY 10001

20  Tel: (212) 372-3030
Fax: (833) 210-3336

21  Email: jamesmarsh@marsh.law
　　　　margaretmabie@marsh.law

22
*Attorneys for Plaintiff*

23

24

25

26

27

28